UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
————————————————————————————————

ANTHONY L. BREEDLOVE,

                 Petitioner,           **DECISION AND ORDER**

    -vs-                        **No. 09-CV-6297(MAT)**

SUPERINTENDENT J. BERBARY,

                 Respondent.

————————————————————————————————

## I.  Introduction

Anthony L. Breedlove ("Breedlove" or "Petitioner") has filed a pro se 28 U.S.C. § 2254 habeas corpus petition alleging that he is being held in state custody in violation of his federal constitutional rights. Breedlove is incarcerated at Upstate Correctional Facility as the result of a December 19, 2003 judgment of conviction entered in New York State Chemung County Court. Breedlove was found guilty, following a jury trial, of depraved indifference murder, second degree criminal possession of a weapon, and two counts of second degree assault.

## II. Factual Background and Procedural History

### A.    Pre-Trial Proceedings

By Chemung County Indictment Number 2003-38, a grand jury charged petitioner with two counts of Murder in the Second Degree (N.Y. Penal Law § 125.25(1)) (intentional murder) and (N.Y. Penal Law § 125.25(2)) (depraved indifference murder), Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law

§ 265.03(2)), and two counts of Assault in the Second Degree (N.Y. Penal Law § 125.05(2)). The charges stemmed from several shootings that occurred at a party hosted by Justine Brockenberry ("Brockenberry") on the night of June 10, 2003. Courtney Swartz ("Swartz"), Michael Torres ("Torres"), Jereck Abrams ("Abrams"), Petitioner and Early Everett ("Everett") were among the guests. Swartz was shot five times and died as a result of his injuries. Torres, who was in the bedroom with Swartz, was shot in his shoulder. Carolyn Payne ("Payne"), another partygoer, was shot in the finger.On July 3, 2003, the trial court conducted a hearing and subsequently denied Petitioner's motion to suppress identification evidence. On October 6, 2003, Petitioner's jury trial commenced.

**B.   The Trial**

**1. The Prosecution's Case**

On June 10, 2003, Justine Brockenberry ("Brockenberry") held a party at her home in the East Gate Apartments in the City of Elmira. She had invited Petitioner and Everett to the party, telling them that she had also invited Swartz (the decedent) and Abrams. Petitioner and Everett arrived for the party around 7:00 or 8:00 p.m. Abrams, accompanied by Swartz and Torres, arrived around 10:30 or 11:00 p.m.

At some time later on, Torres told Abrams that he wanted to leave. Abrams, Torres, and Swartz left Brockenberry's house and went to 395 West Water Street, where Abrams and Swartz lived.

Abrams and Swartz decided to call Brockenberry's house to find out if there was an after-party. They spoke with Shaquia Hackett ("Hackett"); Nicora Bailor ("Bailor"), whom Abrams had once dated; and a woman named Tatiana. Bailor said something to Everett about Abrams, and Everett started yelling, "Oh, them faggots, they'll get it. Fuck these niggers, these big-ass niggers. Tell them to come over!"

Swartz, Abrams, and Torres decided to return to Brockenberry's house to fight Everett. Upon arriving, the three men went immediately into a bedroom, where Swartz and Abrams had planned the fight to take place. The strategy was for Abrams to get a knife from the kitchen. When Swartz grabbed Everett, Abrams would rush Petitioner with the knife to prevent Petitioner from intervening. Torres was supposed to remain in the bedroom

When it was time to carry out the plan, Swartz and Abrams left the bedroom.  Abrams never obtained the knife as planned, however. Furthermore, Swartz was unarmed.

Swartz grabbed Everett, put his arm around Everett's neck, and began choking him. As Abrams walked toward Petitioner, he saw Petitioner pull out a gun from his coat pocket and shoot at Swartz. Abrams ducked into the kitchen. Swartz fled toward the back bedroom, but Petitioner continued firing at him. Swartz went back into the bedroom, joining Torres, and closed the door. Torres saw a few bullets come through the door. When the door flew open,

Torres backed up against it to close it and grabbed Swartz, pulling him to the floor. Torres was then shot in the back of his shoulder.

Swartz pushed Torres to the floor, and Torres crawled under the bed. Swartz was lying on the floor bleeding from his mouth.

Carolyn Payne ("Payne"), who was also at Brockenberry's house, saw Petitioner firing his gun. After two shots, she ran into a bedroom and realized that she had been shot in her left pinky finger.

Petitioner and Everett then ran out of the house. Abrams locked the door behind them, told someone to call 911, and checked on Swartz, who was on the floor in the bedroom gasping for air. Abrams ran across the street to Kim Daniels's home and called 911.

Amber Lockner ("Lockner"), an acquaintance of Petitioner's, was in the area of the East Gate Apartments in the early morning hours of January 11, 2003. When she knocked on the front door of Petitioner's house to see if he was still up, no one answered.

Petitioner and Everett then came running up to Lockner's car and asked for a ride to the gas station. Lockner described Petitioner as looking sick, sweaty, and shaken. Petitioner said that he needed to go to Ithaca. Lockner said she could not take him, but she invited him and Everett to use the phone at her house.

After Petitioner made a phone call, Petitioner poured chlorine bleach on his hands and rubbed his face with the bleach. Later, Lockner saw Petitioner in her backyard removing silver duct

-4-

tape from the handle of a black gun.[1] Lockner called a taxicab for Petitioner and Everett.

Swartz died from his wounds, having sustained three penetrating wounds to his back, and one to his lower right arm. He also had been grazed by a bullet on his upper right buttock.  The nature of two of the back wounds indicated that Swartz was shot at a close range of a few inches.

### 2. Petitioner's Case

Petitioner did not present any witnesses at trial.

### 3. The Verdict and Sentence

On October 9, 2003, the jury acquitted petitioner of second degree (intentional) murder, but convicted him of second degree (depraved indifference) murder, second degree weapons-possession, and two counts of second degree assault for shooting Payne and Torres.

 The trial court sentenced him to concurrent prison terms of from 25 years to life for the murder count; 15 years, plus 5 years of post-release supervision, for the weapon-possession count; and 7 years, plus 3 years of post-release supervision, for each assault count

---

[1]

With Lockner's permission, the police later searched behind her house. They were unable to locate the gun, but recovered duct tape on the ground.

**C.    The Appeal**

On February 16, 2006, the Appellate Division, Third Department, modified the judgment by reversing the second-degree murder conviction on the basis that Breedlove's conduct (shooting the victim fatally five times, with two of the shots being discharged inches from victim's back, resulting in one bullet entering victim's lung and heart and causing his death) was intentional, not reckless, and was legally insufficient to support the conviction of depraved indifference murder. People v. Breedlove, 26 A.D.3d 641 (App. Div 3d Dept. 2006) (citing People v. Payne, 3 N.Y.3d 266, 270 (N.Y. 2004)). The Third Department accordingly vacated the sentence imposed on the depraved indifference murder count. With regard to Breedlove's remaining contentions, the Third Department summarily dismissed them as without merit. Id. The rest of the judgment was affirmed. On April 28, 2006, the New York Court of Appeals denied petitioner's application for leave to appeal. People v. Breedlove, 6 N.Y.3d 846 (N.Y. 2006).

**D.    Motion to Vacate the Judgment**

On June 12, 2006, Petitioner filed a pro se motion pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10, to vacate the judgment of conviction on the grounds that the prosecution violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose that two prosecution witnesses had entered into

cooperation agreements. The prosecution filed an affidavit in opposition asserting that there existed no such cooperation agreements.

On October 24, 2006, the trial court denied relief, concluding that Petitioner's "unsupported allegations-based upon nothing more than the release of the prosecution's witnesses from jail following [petitioner's] trial-[were] completely refuted by the record of trial, wherein defense counsel amply cross-examined the subject witnesses on the issue of cooperation agreements." C.P.L. § 440.10 Order at 2, Respondent's Exhibit ("Resp't Ex.") I). The trial court found that "the record demonstrates that it was explicitly communicated to the jury that said witnesses enjoyed the promise of no specific benefit at the time of trial." <u>Id.</u>

Petitioner thereafter sought leave to appeal the denial of his C.P.L. § 440.10 motion to the Appellate Division, Third Department. On June 10, 2008, the Appellate Division, Third Department, denied the leave application.

### D.   The Federal Habeas Petition

This timely habeas petition followed in which Breedlove asserts several violations of <u>Brady v. Maryland</u>, 373 U.S. 83, <u>supra</u>, by the prosecutor; and that his trial counsel rendered ineffective assistance under the Sixth Amendment. Conceding that all of Breedlove's claims are properly exhausted, Respondent argues

that they nevertheless all lack merit. Petitioner has not filed a traverse in reply to Respondent's answer.

For the reasons that follow, the petition is dismissed.

## III. Discussion

### A. Prosecutorial Failure to Disclose Cooperation Agreements Involving Two Key Prosecution Witnesses in Violation of <u>Brady v. Maryland</u>, 373 U.S. 83

#### 1. Overview of <u>Brady</u>

"The deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" <u>Giglio v. United States</u>, 405 U.S. 150, 153 (1972) (holding that promises of leniency by the government are impeachment evidence that must be disclosed under <u>Brady v. Maryland</u>, 373 U.S. 83) (quotation and citation omitted); <u>accord</u>, <u>e.g.</u>, <u>Drake v. Portuondo</u>, 553 F.3d 230, 240 (2d Cir. 2009).

In <u>Giglio</u>, according to the affidavit of one member of the prosecutor's office, the cooperating witness was told "that if he did testify he would be obliged to rely on the 'good judgment and conscience of the Government' as to whether he would be prosecuted." 405 U.S. at 153 (footnote omitted). The district court in <u>Giglio</u> found that, however definite the first promise had been, the prosecutor who made it was not authorized to do so. The Supreme Court held that neither fact was fatal to defendant's due process claim. Instead, the <u>Giglio</u> court focused upon the fact that a no-prosecution promise had in fact been made, and that both the

witness, in his testimony, and the prosecutor, in summation, had stated otherwise. The Supreme Court held that, since the government's case depended almost entirely on this witness' testimony, his "credibility as a witness . . . an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it." Id. at 155; accord, e.g., Payne, 63 F.3d at 1210 ("The evidence whose disclosure is required under Brady may consist not only of exculpatory evidence but also of impeachment evidence, since '[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence . . . .'") (quotation omitted)).

Thus, "[t]here are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [prosecution], either willfully or inadvertently; and prejudice must have ensued," Strickler v. Greene, 527 U.S. at 281-82. Both exculpatory and impeaching evidence may satisfy the "favorable to the accused" prong. E.g., Banks v. Dretke, 540 U.S. 668, 691 (2004).

### 2.    The Alleged Cooperation Agreements

Petitioner claims that the prosecutor withheld the existence of cooperation agreements with Abrams (one of the participants in

the fight) and Lockner (who called a cab for Petitioner after the shooting and observed him removing silver duct tape from a black gun in her backyard). Petitioner's sole basis for his belief in the existence of such agreements is that shortly after Petitioner was convicted, Abrams and Lockner were released from jail.

Lockner testified pursuant to a waiver of immunity, both at trial and before the grand jury. The immunity agreement was in effect with respect to charges of hindering prosecution and tampering with physical evidence filed after Lockner lied to the police when she claimed that she had been threatened about her cooperation with this case. T.283-84, 290. Lockner also had two open cases in which she was charged with possession of a forged instrument and petit larceny. T.292. Neither the District Attorney's Office nor the police made any promises to Lockner in exchange for her testimony against Breedlove. T. 291-92. She admitted she was hoping for "consideration" for her cooperation. T.291, 293.

As to Abrams, he was being held in Chemung County Jail at the time of Breedlove's trial on charges of first degree rape, criminal impersonation, and assault. The background on these charges was that while he was out of jail, Abrams fled to New York City for two or three months, because he feared for his family's safety after receiving threatening phone calls from unidentified individuals warning him not to testify against Petitioner. When the police

stopped Abrams, he gave them a false name. Abrams testified that neither the police nor the District Attorney's Office promised him anything in exchange for his testimony.

As noted above, the C.P.L. § 440.10 court rejected Petitioner's Brady claim, holding that it was based only on unsupported allegations that any such agreements existed. In contrast, the trial record demonstrated that the witnesses were cross-examined about any possible agreements with the prosecution, and both testified that they were made no promises with respect to their open criminal cases.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, [28 U.S.C.] § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, [28 U.S.C.] § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Under pre- and post-AEDPA jurisprudence, the federal courts have held that the existence of a cooperation agreement between the prosecution and a witness is a factual determination entitled to a presumption of correctness on habeas review. See Shabazz v. Artuz, 336 F.3d 154 (2d Cir. 2003) (habeas petitioner did not present evidence sufficient to rebut presumption of correctness afforded state court factual findings in rejecting Brady claim regarding

undisclosed promises of leniency to prosecution witness); <u>see also</u> <u>Matthews v. Ishee</u>, 486 F.3d 883, 895-96 (6th Cir. 2007) (in rejecting prosecutorial misconduct claim, state court's factual finding that no preexisting plea deal existed in exchange for prosecution witness's testimony was not rebutted by clear and convincing evidence in habeas proceedings so as to warrant grant of habeas relief on basis of a <u>Brady</u> violation for failure to disclose plea deal during trial).[2]

Mere speculation on Petitioner's part is plainly insufficient to overcome the presumption of correctness accorded to the state court's findings that no cooperation agreements existed between the District Attorney's office and Lockner and Abrams. This failure to establish the existence of cooperation agreements is fatal to Petitioner's <u>Brady</u> claims. Accordingly, the <u>Brady</u> claims are dismissed.

**B.   Ineffective Assistance of Trial Counsel**

Petitioner contends that he received ineffective assistance from trial counsel because counsel failed to (1) object to Abrams's testimony that he knew Petitioner from jail; (2) object to Abrams's

---

[2]

See also <u>Moore-El v. Luebbers</u>, 446 F.3d 890, 900 (8th Cir. 2006) (state court's finding that there was no credible evidence that there was an agreement for leniency between prosecutor and prosecution witness was entitled to presumption of correctness, and petitioner's <u>Brady</u> claim based on states's failure to disclose purported agreement did not rebut presumption); <u>Wisehart v. Davis</u>, 408 F.3d 321, 323-24 (7th Cir. 2005) (finding by state court that there was no agreement between prosecution and its key witness to testify against petitioner was binding upon federal habeas court addressing petitioner's <u>Brady</u> claim in absence of clear and convincing evidence to rebut factual finding).

testimony that he moved his residence due to threats he had received; (c) object when the prosecutor stated in the presence of the jury that he needed an adjournment to locate a witness; (d) object to the admission of the duct tape and testimony regarding the duct tape; (e) request a jury charge on the justification defense; and (f) object to the jury's repugnant verdicts.

The ineffectiveness claim was among those summarily rejected by the Third Department as "without merit." People v. Breedlove, 26 A.D.3d at 642. This adjudication on the merits was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. See 28 U.S.C. § 2254(d)(1).

### 1.   The **Strickland** Standard

In order to establish that he received the ineffective assistance of trial counsel, Petitioner must show both that his attorney provided deficient representation and that he suffered prejudice as a result of that deficient performance. Strickland v. Washington, 466 U.S. 668, 687 (1984). The deficient performance prong necessitates showing show that "counsel's representation fell below an objective standard of reasonableness[.]" Id. at 686. The prejudice prong requires a showing that "counsel's conduct had "so undermined the proper functioning of the adversarial process" that the process "cannot be relied on as having produced a just result." Id. at 688. In other words, Petitioner is required to show that

there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

A court reviewing an ineffective assistance of counsel claim is required to "indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance," and petitioner bears the burden of overcoming that presumption. Id. at 689. Although Strickland sets forth two prongs, a reviewing court need not address both if the petitioner makes an inadequate showing on one. Id. at 697.

  2.  **Trial Counsel's Alleged Errors**

  a.  **Failure to Object to Testimony Regarding Petitioner's Prior Incarceration**

Petitioner argues that trial counsel should have objected to Abrams's testimony that he had known Petitioner from the time they were in jail and housed together on the "juvenile block". T.99. Respondent concedes that this testimony was improper and could have been stricken from the record upon an objection. Respondent argues, however, that there is no basis to conclude that the failure to object caused counsel's performance to fall below an objective standard of reasonableness or undermined the proper functioning of the adversarial process, particularly in light of counsel's overall trial performance. Strickland, 466 U.S. at 686, 688. As Respondent notes, "Strickland does not guarantee perfect representation, only

-14-

a reasonably competent attorney." <u>Harrington v. Richter</u>, 131 S. Ct. 770, 791 (2011)(internal quotations and citations omitted).

It was not an unreasonable trial strategy not to object to Abrams' mentioning that he been incarcerated with Petitioner. Trial counsel reasonably could have concluded that he should let the testimony come in without objection in order to avoid drawing the jury's attention to it. <u>See</u> <u>Young v. McGinnis</u>, No. 98-CV-281 (JBW), 2006 WL 463507, at *45 (E.D.N.Y. Feb. 24, 2006) ("Petitioner contends that counsel should have moved to strike Somie's mention of defendant's having been in jail. Rather than moving to strike the testimony and thereby drawing the jury's attention to this brief portion of one of Somie's answers on cross-examination, it made sense for him to remain silent and hope the jury had missed the allusion. . . . He could have asked the trial court to give the jury some special instructions regarding the testimony, but that would have highlighted the matter and possibly suggested that petitioner had something to hide."). Furthermore, the "testimony was only minimally prejudicial[,]" <u>Id.</u>

### b.   Failure to Object to Testimony Concerning Threats

Breedlove contends that trial counsel erroneously failed to object to Abrams's testimony that he had moved to New York City because he had been threatened in connection with his testimony against Petitioner.

-15-

As an initial matter, it is "settled [under New York law] that testimony that a defendant has threatened a witness is admissible on the ground that it 'has some tendency to prove consciousness of guilt.'" People v. King, 175 A.D.2d 266, 572 N.Y.S.2d 723 (App. Div. 1991)(quoting People v. Whaley, 144 A.D.2d 510, 534 N.Y.S.2d 201 (App. Div. 1988)); see also United States v. Lord, 565 F.2d 831, 835 n.2 (2d Cir.1977) ("Evidence of conduct designed to impede or prevent a witness from testifying is admissible to show consciousness of guilt.") (citation omitted).

Furthermore, that testimony was admissible because it was directly responsive to trial counsel's questions on cross-examination. Petitioner's counsel elicited that Abrams had fled the jurisdiction by going to New York City while his criminal case was pending. Counsel asked Abrams if he had left in order to avoid facing the indictment against him. Abrams responded that he went to New York City not to avoid the pending charges, but because he and his family had been threatened as a result of his cooperation in this case. T.142. Because defense counsel elicited this testimony, there was no basis to object to Abrams's response.

On redirect examination, the prosecutor was entitled to question Abrams further with regard to the threats against him and his family since the defense had opened the door to such questioning. T.151-53. See People v. Davenport, 35 A.D.3d 1277, 1278 (App. Div. 4th Dept. 2006) (testimony elicited during

-16-

cross-examination can open the door to evidence that would otherwise be inadmissible).

The Court will not fault trial counsel's strategy of questioning Abrams about his flight from the jurisdiction. The extent and the manner in which cross-examination is conducted is "strategic in nature" and is the kind of "tactical decision . . . engaged in by defense attorneys in almost every trial." United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987). Counsel's decision to ask Abrams about his reasons for going to New York City was part of a reasonable strategy to undermine Abrams's credibility by showing that he attempted to flee in order to avoid criminal charges. Counsel argued that Abrams' credibility was suspect since he put his interests above those of society by disregarding court orders to stay in the area. Indeed, trial counsel adroitly utilized Abrams' cross-examination testimony to this effect during summation.

Counsel could not have anticipated that Abrams would explain his behavior by asserting that he had been threatened in connection with his decision to testify against petitioner. The Court declines to deem Breedlove's attorney ineffective simply because his line of questioning produced some testimony that he could not have reasonably foreseen.

### c.   Failure to Object Holding a Colloquy Regarding a Missing Witness in the Jury's Presence

Petitioner also faults trial counsel for failing to object when the trial court did not excuse the jury during a colloquy in which the prosecutor asked for an adjournment to locate a witness. Petitioner contends that the jury improperly was allowed to hear the prosecutor describe his attempts to locate the witness, as well as efforts by the Rochester Police Department and the New York State Police Violent Felony Squad. According to Petitioner, the jury could have inferred that the missing witness was Everett, and that Everett would have given favorable testimony on behalf of the prosecution had he been found.

This claim is without merit. There simply is no basis for concluding that the jury was prejudiced since there was nothing said during the colloquy from which the jury could have concluded that Everett was the witness in question. The prosecutor did not name the potential witness, and the witness was never produced at trial. Beyond Petitioner's speculation, there is no basis to conclude that certainly the jury had no reason to speculate that Everett would have testified favorably for the prosecution. Trial counsel will not be faulted for failing to make a baseless objection.

-18-

### d.   Failure to Object to Testimony Concerning the Gun and Duct Tape

Petitioner contends that trial counsel should have objected to the admission of the discarded silver duct tape as well as testimony by Petitioner's acquaintance, Lockner, relating to the duct tape.  However, there was no basis to object to that evidence. Lockner testified that in the early morning hours of January 11, 2003, she encountered Petitioner and Everett and brought them back to her home. Lockner observed Petitioner in her backyard removing silver duct tape from the handle of a black gun. This testimony provided essential narrative, establishing Petitioner's activities immediately following Swartz's killing.  Lockner's account was relevant to establish that Petitioner maintained control of the gun following the shooting and removed the duct tape from the weapon, thereby altering it and affecting its evidentiary value.  In addition, testimony by the police that they later recovered silver duct tape from the back porch area behind Lockner's house was relevant to corroborate Lockner's account of her observations.

Contrary to Petitioner's contention, there was no reason for the jury to conclude that Investigator Dibble's testimony about recovering the duct tape from Lockner's back yard suggested that Petitioner had told the police where to find the duct tape or explained its significance. Inv. Dibble testified that Lockner had given the police permission to search her yard and had spoken with the police during the search.  Accordingly, the duct tape and the

-19-

testimony pertaining to it were properly admissible. Trial counsel had no valid basis for objecting to its introduction into evidence. Petitioner thus cannot show that counsel was deficient in failing to lodge a meritless objection or that he was prejudiced, since the objection would have been overruled.

### e.   Failure to Request a Justification Jury Instruction

Breedlove faults trial counsel for failing to request the jury be charged on the justification defense. Under New York's justification defense, "a person may use physical force upon another person when, and to the extent he . . . reasonably believes such to be necessary to defend himself . . . or a third person from what he . . . reasonably believes to be the use or imminent use of unlawful physical force by such person." N.Y. PENAL LAW § 35.15(1). A person may not use deadly physical force unless "[t]he actor reasonably believes that such other person is using or about to use deadly physical force." N.Y. PENAL LAW § 35.15(2)(a). Even in such an event, "the actor may not use deadly physical force if he . . . knows that with complete personal safety, to oneself and others he . . . may avoid the necessity of so doing by retreating." N.Y. PENAL LAW § 35.15(2)(a). Deadly physical force refers to "physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury." N.Y. PENAL LAW § 10.00(11).

-20-

Given the trial evidence, any request for the charge would have been properly denied because there was no reasonable view of the evidence, even considering that evidence in the light most favorable to the defense, from which a jury could conclude that Breedlove's actions were justified. See People v. Padgett, 60 N.Y.2d 142, 145 (N.Y. 1983) ("[C]onsidering whether the trial court's charge to the jury was adequate, the record must be considered most favorably to defendant. If, taking that view of the record, the evidence supports the defense of justification, the trial court should instruct the jury as to the defense and must when so requested. Thus, if on any reasonable view of the evidence, the fact finder might have decided that defendant's actions were justified, the failure to charge the defense constitutes reversible error.").

The evidence established that Swartz and Abrams went to Brockenberry's house intending to start a fight with Everett, and that Swartz (the decedent) set off the fracas by choking Everett. However, the evidence also showed that both Swartz and Abrams were unarmed.

Petitioner escalated the violent and dangerous situation by pulling out his gun and firing at Swartz. After Swartz released his chokehold on Everett and ran into a back bedroom, Petitioner pursued Swartz, firing his gun several times at the closed bedroom door behind which Swartz and other house occupants were hiding.

-21-

T.106-09, 111-12, 128-29, 132-35, 235-36. Petitioner's actions here were clearly disproportionate to any threat that Swartz may have posed to Everett. And, since Petitioner continued to fire his gun at the unarmed Swartz as he was in full retreat, there was no reasonable view of the evidence that would support a justification defense. It logically follows that because the Swartz shooting was not justified, Petitioner could not use the defense to avoid the second degree assault charges he amassed as the result of shooting Payne and Torres while shooting at Swartz.

Finally, the justification defense is unavailable in a prosecution for second degree weapons-possession. See People v. Pons, 68 N.Y.2d 264, 267 (N.Y. 1986) (holding that "because possession of a weapon does not involve the use of physical force . . . there are no circumstances when justification . . . can be a defense to the crime of criminal possession of a weapon").

Breedlove's attorney was not ineffective for failing to request a jury charge on the justification defense when the proof did not warrant it. There is no reasonable possibility that the trial court would have agreed to issue the charge, and thus he cannot demonstrate prejudice.

### f.   Failure to Object to Repugnant Verdicts

Petitioner also argues that his attorney erroneously failed to object to the jury's verdicts on the grounds that they were repugnant. Under New York law, a repugnant verdict is one that is

"inherently self-contradictory." People v. Trappier, 87 N.Y.2d 55, 58 (N.Y. 1995) (internal citations omitted). In other words, a New York court may set aside a verdict as repugnant "where the defendant is convicted on an offense containing an essential element that the jury has found the defendant did not commit." Id. (internal citation omitted).

Petitioner contends that the conviction on the depraved indifference murder count negated his convictions on the weapons-possession and assault counts. However, New York courts have regularly held that jury acquittals on reckless and intentional crimes do not negate convictions for second degree weapons-possession based on possessing a firearm with the intent to use it unlawfully against another person. See People v. Jackson, 50 A.D.3d 700, 701 (App. Div. 2d Dept. 2008) (acquittal of second degree murder, first and second degree assault, and first degree reckless endangerment do not negate any elements of second degree weapons-possession) (collecting cases).

Furthermore, Petitioner's conviction of depraved indifference murder-although it was later overturned on sufficiency-of-the-evidence grounds-was not repugnant to his second degree assault conviction for shooting Torres and Payne while trying to shoot Swartz. It is entirely possible for Petitioner to have intended to inflict physical injury upon Swartz (and thereby cause physical injury to Torres and Payne) and recklessly create a grave risk that

-23-

he would cause Swartz's death. See People v. Trappier, 87 N.Y.2d at 59 ("A defendant could certainly intend one result–serious physical injury–while recklessly creating a grave risk that a different, more serious result–death would ensue from his actions."). In Trappier, for example, the New York Court of Appeals found that the defendant could have fired at the victim with the intent to cause him only serious and protracted disfigurement and simultaneously, consciously disregarded a substantial and unjustifiable risk that, by so doing, he would create a grave risk of a more severe outcome, the victim's death. Trappier, 87 N.Y.2d at 59. Thus, a finding that defendant was guilty of attempted first degree assault did not "necessarily negate his guilt of first degree reckless endangerment[.]" Id. (citing N.Y. Crim. Proc. Law § 300.30(5)).

Likewise, there was in Breedlove's case no basis for defense counsel to argue that the verdicts were repugnant. Trial counsel cannot be faulted for failing to make an argument that had no chance of success, and Petitioner accordingly was not prejudiced by counsel's omission.

## IV.  Conclusion

For the reasons stated above, Anthony Breedlove's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the Petition is dismissed. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, the Court declines to issue a certificate of appealability. See 28

-24-

U.S.C. § 2253(c)(2).  The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal <u>in forma pauperis</u>.

    **SO ORDERED.**

                        S/Michael A. Telesca

                     _____
                          MICHAEL A. TELESCA
                    United States District Judge

DATED:      August 5, 2011
             Rochester, New York